## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**KENNETH RAY BATES,**

      **Plaintiff,**

**v.**                                                **Civil Action No. 1:19cv171**
                                                     **(Judge Kleeh)**

**UNITED STATES OF AMERICA,**

      **Defendant.**

## REPORT AND RECOMMENDATION

### I. Introduction

On September 5, 2019, the *pro se* Plaintiff, an inmate incarcerated at FCI Hazelton in Bruceton Mills, West Virginia, initiated this case by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"). ECF No. 1. Plaintiff's complaint was accompanied by a motion to proceed as a pauper with supporting documents. ECF Nos. 3, 4, 5.[1] By Order entered September 10, 2019, Plaintiff's motion to proceed as a pauper was denied as moot. ECF No. 8. By Order entered October 1, 2019, the Defendant was ordered to answer the complaint. ECF No. 12. On December 6, 2019, the Defendant filed a motion to dismiss or in the alternative, motion for summary judgment with a memorandum in support with attachments and a motion to seal. ECF Nos. 18, 19. By Order entered December 9, 2019, Defendant's motion to seal was granted. ECF No. 20. Because Plaintiff was proceeding *pro se*, a Roseboro Notice was also issued. ECF No. 22. Plaintiff did not file a response. However, on December 18, 2019, plaintiff moved for appointed counsel. ECF No. 26. By Order entered January 13, 2020, Plaintiff's motion for appointed counsel was

---

[1]However, Plaintiff had already been granted permission to proceed as a pauper in a previous iteration of this case that was dismissed as prematurely filed; those fees were directed to be applied to this case. See ECF No. 2; see also Case No. 2:19cv6, ECF No. 27 at 1 – 2.

denied. ECF No. 28. On May 14, 2020, the Defendant filed a Motion to Dismiss for lack of prosecution because Plaintiff had not filed a Roseboro response to its first dispositive motion; on May 26, 2020, before the Court had an opportunity to issue a Notice of Right to Respond, Plaintiff filed a response in opposition. ECF No. 31.

This matter is before the undersigned for review, report and recommendation pursuant to LR PL P 2, *et seq*., and 28 U.S.C. § 636(b)(1)(B).

## II. Background[2]

On September 3, 1998, Plaintiff and two co-defendants were named in a two-count indictment in the United States District Court for the Northern District of Ohio, charging them with Armed Bank Robbery in violation of 18 U.S.C. § 2113 and Use of a Firearm During an Offense of Violence, in violation of 18 U.S.C. § 924. ECF No. 1. On April 12, 2000, after a 5-day jury trial, Plaintiff was convicted on both counts. ECF No. 193. On September 15, 2000, Plaintiff was sentenced to an aggregate prison term of 324 months on both counts. ECF No. 237.

Plaintiff timely appealed. ECF No. 238. On April 15, 2002, the Sixth Circuit Court of Appeals affirmed the district court's judgment. ECF No. 277.

Plaintiff is scheduled to be released on May 15, 2022, via a Good Conduct Time Release.[3]

On January 20, 2015, Plaintiff was designated to the United States Penitentiary (USP) at FCC Hazelton and remained there until June 20, 2019; he is presently designated to FCI Hazelton. See SENTRY computerized Inmate History for Kenneth Bates, ECF No. 18-3 at 7.

---

[2] Unless otherwise noted, the information in this section is taken from Bates' criminal docket available on PACER and all ECF numbers are from that case. See United States v. Anthony, et. al, No. 3:98cr817-CAB-3. Philips v. Pitt Cnty. Mem. Hosp., 572 F. 3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of public record); Colonial Penn. Ins. Co. v. Coil, 887 F.2d 1236, 21239 (4th Cir. 1989) ("We note that 'the most frequent use of judicial notice is in noticing the contents of court records.'").

[3] See Bureau of Prison's ("BOP") inmate locator, FEDERAL BUREAU OF PRISONS, FIND AN INMATE, https://www.bop.gov/inmateloc/ (last visited June 12, 2020).

### III. The Pleadings

#### A. The Complaint

Plaintiff's complaint, filed without a memorandum in support, raises claims of gross negligence, deliberate indifference, and violation of environmental health rules resulting in personal injury. ECF No. 1 at 6. More specifically, Plaintiff alleges that on an unspecified date, but possibly in or around late May or early June 2018, and continuing for "a period of 30 days," 5 or 6 birds gained access to ventilation shafts of his unit at USP Hazelton, Unit D-2. Id.; see also ECF No. 1-2 at 1. Plaintiff contends that the unsanitary contagion caused by the birds' feces infected "the entire unit," posed a danger to the health of inmates like himself [ECF No. 1-4 at 3]; that some inmates developed flu-like symptoms as a result [id.]; and he personally was treated for sinus infection, cough/sneezing, and diarrhea.  ECF No. 1 at 9. Plaintiff further contends that he was exposed to strains of a subtype of the causative orthomyxovirus that has produced epidemics in birds and humans, for which he received no testing, and further, he was never given the results of the tests that were performed. ECF No. 1-4 at 7.

Plaintiff avers that on December 11, 2018 [sic], he filed an Administrative Tort Claim Form, and received an acknowledgement [sic] on March 22, 2019 [sic]. ECF No. 1 at 4. Attached to his complaint is a copy of his January 18, 2019 Administrative Tort Claim Form, and a May 23, 2019 Administrative Tort Claim denial letter, assigning claim number TRT-MXR-2019-03149 to Plaintiff's claim. ECF Nos. 1-3 at 1, 3.

In Plaintiff's complaint, under § VII, "Injury," he avers that "I had to get medical treatment for sinus infection, diarrhea, coughing and sneezing. Received medication and was given a shot."  ECF No. 1 at 9.   In addition to the Administrative Tort Claim documents, he

attaches a copy of the dismissal Order entered in the prior iteration of this case and some excerpts

from his medical records in support of his claims. ECF Nos. 1-1 – 1-4.

As relief, Plaintiff seeks a judgment of Three[4] Thousand Five Hundred Dollars ($3,500.00)

plus court costs. ECF No. 1 at 9.

## B. The Government's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment

In support of its dispositive motion, Defendant contends that the complaint should be

dismissed or summary judgment granted in its favor because:

1) Plaintiff's negligence claims are insufficiently pled and fail to state a claim upon which relief can be granted. ECF No. 18-1 at 4.

2) Plaintiff's claims of deliberate indifference to serious medical needs are not cognizable in a FTCA action because they are constitutional claims that must be raised in a civil rights action.[5] Id. at 6.

In support of its arguments, Defendant attaches two sworn declarations with exhibits,

including copies of certain of Plaintiff's medical records. ECF No. 18-2 - 18-4; see also ECF No.

19-1 at 19.

## D. Defendant's Motion to Dismiss for Failure to Prosecute

Defendant contends that this matter should be dismissed pursuant to Fed.R.Civ.P. 41(b) for

failure to prosecute, because Plaintiff filed no response to the Roseboro Notice. ECF No. 30.

## E. Plaintiff's Response in Opposition to Defendant's Motion to Dismiss for Failure to Prosecute

---

[4] This amount stated in the claim for relief appears to have been erased and/or overwritten, and differs from the amount Plaintiff's complaint stated he requested in his administrative tort claim. *Cf.* ECF No. 1 at 4 and 9.

Further, while Plaintiff's attached Form 95 Administrative Tort Claim for Damage, Injury, or Death is hand-written, except for the total amount of claimed damages, which were typewritten, it appears that someone hand-wrote over the first digit in the damages number to make it appear that it was a '3,' as in $3,500.00, and not some other amount. See ECF No. 1-3 at 1. Nonetheless, the May 23, 2019 denial letter states that Plaintiff claimed government liability in the amount of $3,500.00. ECF No. 1-4 at 3.

[5] The United States' response makes no mention of Plaintiff's third claim regarding violations of the rules regarding environmental health and safety.

Plaintiff argues that this Court's denial of his motion for appointed counsel indicates that the facts of this case were so clear that no appointment of counsel was necessary. ECF No. 31 at 1. Further, he contends that he is a layman, untrained at law and unfamiliar with the Federal Rule of [Civil] Procedure and that because of the coronavirus, the prisons within the BOP have been on lockdown for two months.[6] Id. at 2. He urges the Court to disregard Defendant's argument and adjudicate this case on the facts already provided, noting that "the defendant[] has already tried to fabricate the medical records by leaving things out of the records. However, the plaintiff has presented all of [the] factual records." Id.

## IV. Standard of Review

### A. Motion to Dismiss 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits dismissal of a case when a complaint fails to state a claim upon which relief can be granted. The Federal Rules of Civil Procedure require only "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). Courts long have cited "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46.

---

[6] The undersigned notes that if this statement was intended to be an implied excuse for Plaintiff's failure to timely file a response to the Roseboro Notice, two month prior to May 19, 2020 (the date on which Plaintiff signed his May 26, 2019 response in opposition to the United States' motion to dismiss for failure to prosecute) would have been on or about March 19, 2020. However, Plaintiff's response to the Roseboro Notice was due almost three months earlier, on December 30, 2019.

Plaintiff is proceeding *pro se* and therefore the Court must liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 – 21 (1972) (*per curiam*); Erickson v. Pardus, 551 U.S. 89, 94 (2007). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, *supra* at 520–21. "[T]he mandated liberal construction afforded to *pro se* pleadings 'means that if the court can reasonably read the pleadings to state a valid claim on which the petitioner could prevail, it should do so.'" Barnett v. Hargett, 174 F.3d 1128, 1133 (10th Cir. 1999). However, "judges are [] not required to construct a party's legal arguments for him." Small v. Endicott, 998 F.2d 411, 417 – 8 (7th Cir. 1993).

Although a complaint need not contain detailed factual allegations, a plaintiff's obligation in pleading "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . ." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Accordingly, "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face." Id. at 555, 570. In Twombly, the Supreme Court found that "because the plaintiffs [] have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." Id. at 570. Thus, to survive a motion to dismiss, a plaintiff must state a plausible claim in his complaint which is based on cognizable legal authority and includes more than conclusory or speculative factual allegations.

"[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," because courts are not bound to accept as true a legal conclusion couched as a factual allegation. Id. at 678. "[D]etermining whether a complaint states a plausible claim . . . [is] a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." Id. at 679. Thus, a well-pleaded complaint must offer more than "a sheer possibility that a defendant has acted unlawfully," in order to meet the plausibility standard and survive dismissal for failure to state a claim. Id. at 678.

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) (citing 5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1356 (1990)). In considering a motion to dismiss for failure to state a claim, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d1130, 1134 (4th Cir. 1993); see also Martin, 980 F.2d at 952.

"Ordinarily, a court may not consider any documents that are outside of the complaint, or not expressly incorporated therein, unless the motion is converted into one for summary judgment." Alternative Energy. Inc. v. St. Paul Fire and Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001) (cited with approval in Witthohn v. Federal Ins. Co., 164 Fed. Appx. 395 (4th Cir. 2006) (unpublished)). There are, however, exceptions to the rule that a court may not consider any documents outside of the complaint. "Courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 2509 (2007).

## B. **Motion for Summary Judgment**

Pursuant to Federal Rule of Civil Procedure 56(a), the Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In applying the standard for summary judgment, the Court must review all the evidence in the light most favorable to the nonmoving party. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion to, "demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. Once "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

"The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a verdict." Anderson, supra at 256. Thus, the nonmoving party must present specific facts showing the existence of a genuine issue for trial, meaning that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." Id. The "mere existence of a scintilla of evidence" favoring the nonmoving party will not prevent the entry of summary judgment. Id. at 248.

To withstand such a motion, the nonmoving party must offer evidence from which a "fair-minded jury could return a verdict for the [party]." Id. "If the evidence is merely colorable, or is

not significantly probative, summary judgment may be granted." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Such evidence must consist of facts which are material, meaning that they create fair doubt rather than encourage mere speculation. Anderson, *supra* at 248.

Summary judgment is proper only "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, *supra* at 587. "Where the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. *citing* First Ntl. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968). See Miller v. Fed. Deposit Ins. Corp., 906 F.2d 972, 974 (4th Cir. 1990). Although any permissible inferences to be drawn from the  underlying facts must be viewed in the light most favorable to the party opposing the motion, where, the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate. Matsushita, *supra* at 587-88; Anderson, *supra* at 248-49.

## V. Analysis

### A. Factual History

On May 14, 2018, in a 10:17 a.m. Sick Call Health Services encounter at his Housing Unit, Plaintiff was seen for complaints of a runny nose, sore throat, chills, dry cough, and intermittent joint pain for the past 4 days; he requested Tylenol for relief.  ECF No. 19-1 at 2.  His temperature on that visit was "unavailable" and his pulse was slightly elevated at 85. Id. The back of his throat appeared red, but there was no obvious purulent or sinus drainage or white plaques. Id. He was diagnosed with acute pharyngitis[7] and was prescribed Tylenol, as needed for fever, pain, and inflammation. Id. at 3.

---

[7] Acute pharyngitis is inflammation of the pharynx, or the back of the throat; it is most commonly referred to simply as a "sore throat."

On June 17, 2018, Plaintiff sent this email to "Ms. Bird" at USP Blue Sick Call:

To: Ms [sic] Bird
Inmate Work Assignment: resource/clerk

Hello Ms. Bird.
i would like to bring to your attention that we have had about five birds from the outdoors flying in the d-2unit, 3 of the birds was apprehended by the second shift officers. there is still two of the birds been flying around, they drink out of the water fountains where we get hot & cold water. there is different inmates in the unit that is sick, when i come in from outdoors i automatically start coughing and sneezing. i have contacted some type of flu systems, i would appreciate being seen by medical. thank you.

ECF No. 1-4 at 9.

On June 18, 2018, at 2:28 p.m., Plaintiff again presented to Health Services via Sick Call, now with complaints of itchy eyes, cough, and green nasal discharge. ECF No. 1-2 at 5.[8] He reported that there were birds living in the housing unit vents and that for the past five days, whenever he came in from outdoors, he began coughing and sneezing; he denied having taken anything for the symptoms. Id. He also denied fever or chills, and reported having had a single episode of diarrhea. Id. His vital signs were within normal limits, except for his blood pressure, which was slightly elevated at 134/90. Id. at 5, 2. His oxygen saturation was 97 on room air.[9] Id.

---

[8] Plaintiff attached a copy of the notes from this June 18, 2018 2:28 p.m. visit to his complaint. The notes have "**See Amendment**" stamped in large bold font on the diagonal across the page. See ECF No. 1-2 at 5, 2, 1, 4. Plaintiff also produced another version of what appears to be the same visit, but without the "**See Amendment**" stamp on them; records of this iteration of the visit are noted to have occurred at 2:58 p.m., thirty minutes later on the same day. Inexplicably, this later version omits several things that were included in the first iteration of the visit: Plaintiff's vital signs; any mention of the Methylprednisolone acetate injection; and any mention of the possibility of avian flu related to the birds in the ventilation shafts. The undersigned notes that while the Plaintiff produced copies of both versions of the visit, the United States' response only attached a copy of the second version.

[9] SaO2, or oxygen saturation, refers to the amount of oxygen bound to hemoglobin in arterial blood. SaO2 can be measured either by Arterial Blood Gas (ABG) analysis or by pulse oximetry. Normal oxygen saturation levels as measured by pulse oximetry range from 95% to 100%. Values under 90% are considered low.
See What is the difference between O2Sat and SaO2? Both appear to indicate oxygen saturation levels, available at: < https://ptfinalexam.com/knowledgebase/what-is-the-difference-between-o2sat-and-sao2-both-appear-to-indicate-oxygen-saturation-levels/ > and Safe Oxygen Levels: What Should My Oxygen Level Be? *available at:* < https://www.inogen.com/blog/safe-oxygen-levels/ >

at 2. His weight was 202.2#. Id. He also reported some constipation. Id. at 5. On exam, he appeared well, was not in distress, had clear nasal discharge, and sinus drainage. Id. at 5, 2. He also had effusions behind the tympanic membranes of both ears.[10] Id. at 2. His lungs were clear to auscultation. Id.  A complete blood count ("CBC")[11] was ordered,[12] as was a chest x-ray. Id. at 1. He was diagnosed with allergic rhinitis[13] and instructed to follow up at sick call as needed. Id. Under "Plan," a new medication was ordered: Methylprednisolone acetate injection[14] 80 mg/ml, 1 ml to be given intra-articularly[15] [sic] one time; the note appears to indicate that it was given "now." Id. at 1. The indication for the drug was "allergic rhinitis." Id.; see also Declaration of Brett Friend, Health Services Administrator, FCC Hazelton ("Friend Decl."), ECF No. 18-4 at 2.

---

[10] Otitis media with effusion (OME) is a condition in which there is fluid in the middle ear, but no signs of acute infection. As fluid builds up in the middle ear and Eustachian tube, it places pressure on the tympanic membrane (ear drum). The pressure prevents the tympanic membrane from vibrating properly, decreases sound conduction, and therefore results in a decrease in patient hearing.  It occurs in children and adults; in adults, it can be caused by inflammation driven by viruses or allergies. See Otitis Media With Effusion, *available at*: < https://www.ncbi.nlm.nih.gov/books/NBK538293/ >

[11] A CBC is a group of tests that evaluate the cells that circulate in blood, including red blood cells (RBCs), white blood cells (WBCs), and platelets (PLTs). The CBC can evaluate overall health and detect a variety of diseases and conditions, such as infections, anemia and leukemia. See Complete Blood Count (CBC), *available at*: < https://labtestsonline.org/tests/complete-blood-count-cbc >

[12] A report on the results of that test was not produced by either party.

[13] Allergic rhinitis, also known as hay fever, is often related to seasonal allergies or other environmental irritants. See What is Rhinorrhea?, *available at*: <https://www.news-medical.net/health/What-is-Rhinorrhea.aspx >

[14] Methylprednisolone acetate injection (brand names A-Methapred, Depo-Medrol, SoluMEDROL) is a steroid used to treat acute exacerbations of many conditions.  See Methylprednisolone acetate injection, available at: < https://www.rxlist.com/depo-medrol-drug.htm#description >

[15] An intra articular injection is one that is given into a joint; its reference here appears likely to be a typographical error, possibly related to computer-assisted charting, because intra-articular injection would not be the method of administration of steroid given for seasonal or perennial allergic rhinits; the provider likely meant to choose "intra muscular," which would be the appropriate way to administer this drug under those circumstances. If Plaintiff had actually received an intra articular injection, the provider would have specified what joint was injected; moreover, intra articular injection of steroid is only appropriate when used as adjunctive therapy for short-term administration of acute exacerbations of a variety of rheumatic, arthritic, bursitic, or synovitic conditions, none of which Plaintiff had. See Methylprednisolone acetate injection, available at: < https://www.rxlist.com/depo-medrol-drug.htm#description >

Plaintiff was instructed to follow up at Sick Call if needed and to return immediately if his condition worsened. ECF No. 1-2 at 1. Under "Other," the provider noted that "[w]ith the Bird's [sic] in the unit, will check a CBC and CXR to rule out any additional abnormalities (i.e. Avian flu). Likely allergy related. Inmate encouraged to purchase OTC Allergy relief and/or nasal spray." Id.

On or about June 20, 2018, Plaintiff filed a Request for Administrative Remedy Informal Resolution Form, complaining of violations of "Rules 38, 41, 42, and 43 (Misconduct) 3420.11 See Attachment." ECF No. 1-4 at 1. He requested that "[b]irds [be] removed from unit (unsanitary conditions). Id. Attached to his Informal Resolution Form was a statement noting that

> On June 7, 2018, Counselor VanKirk contacted both the medical staff and facilities department to make a complaint concerning a number of birds trapped within the unit. They are continuing to be loose and flying around within the unit (D2) and have made their homes in the ventilation shafts and overhead vents.
>
> These wild birds are leaving feces and other contagion throughout the unit (especially in the eating and drinking areas due to their needs for food and water). These birds are a continual cause of inmate sickness (me included). I have had to go to medical for flulike symptoms (coughing, sneezing, sinus infection, diarrhea, etc.) on 6/18/2018 and was given an injection by the medical staff.
>
> These conditions are unsanitary and [are] violations of the rules for health and safety in this institution.  This is a clear case of misconduct (3420.11), conduct that could lead others to question and employees' [sic] impartiality (Rule 38), institutional violations of the rules (Rule 41), reckless disregard of the rules (Rule 42), and negligent violations (Rule 43).
>
> The warden and staff of this institution have done nothing to remove this contagion from the unit's environment, rather [they] have allowed the birds to remain unchecked in the living space of inmates.

Id. at 2.

On June 20, 2018, his Unit Manager responded, noting "Issue Un-resolved No Relief granted," and that "I have notified Safety and Facilities Depts." Id. On June 21, 2018, Plaintiff

filed a Request for Administrative Remedy over the issue, repeating his claim about the birds and noting in pertinent part that

> . . . There was a total of about 5 to 6 birds flying around in the unit. OFFICER ALT, whom work [sic] the second shift[,] apprehended about 3 of the birds, which we still have birds living in the ventilation shafts . . . The birds has [sic] been in the unit for over 3 weeks and still has [sic] not been removed. This is a danger to all the inmates that is Living [sic] In [sic] the d-2 program unit at U.S.P. Hazelton . . .

Id. at 3.

Plaintiff's chest x-ray was performed on June 26, 2018; no acute cardiopulmonary disease was seen and his lungs were clear. See June 26, 2018 Statrad X-Ray Report, id. at 9.

On June 29, 2018, Plaintiff returned to Health Services at 7:41 a.m. via Sick Call with complaints of sneezing, watery eyes, and rhinorrhea of several days' duration.[16] ECF No. 19-1 at 11. He stated he had been exposed to bird dropping "antigens" that he felt were responsible for his symptoms, but reported that his symptoms were improving. Id. He denied fever, chills, shortness of breath, chest pain, cough, nosebleed, or coughing up blood. Id. His tympanic membranes were normal and his lungs were clear. Id. at 11 – 12. His vital signs were within normal limits.  Id. at 12. His weight was 197#.[17] Id. He denied vomiting and diarrhea. Id. at 13. He was diagnosed with an acute upper respiratory infection and instructed to follow up at sick call and/or Chronic Care Clinic as needed. Id.; see also Friend Decl., ECF No. 18-4 at 3.

On July 9, 2018, Plaintiff received a response to his Request for Administrative Remedy from the Warden, who noted in pertinent part that

> . . . Our review of this matter revealed there were six birds residing in the ventilation system in Unit D2. Once your Unit Team became aware of the situation they notified the Safety and Facilities departments. Both departments have been to the unit and attempted to remove the birds from the ventilation

---

[16]  Rhinorrhea is the medical term for a runny nose.

[17]  This was a 5.2# weight drop within 11 days, from June 18, 2018.

system. On June 25, 2018, the Facilities Department brought equipment to the unit and was able to remove all but one of the birds. We are currently taking measures to remove the final bird.[18]

Discussion with the Clinical Director at Hazelton indicates there were no record of inmates reporting to health services with flu like symptoms. If you are having health issues you are advised to report to sick call . . .

ECF No. 1-4 at 4.

On July 13, 2018, Plaintiff filed a Regional Administrative Remedy Appeal, stating that

The reason for this appeal is to set the record straight  on the Warden's response to my Administrative Appeal dated 07/09/2018. In this response, the Warden stated several factual details concerning the original grievances. First, he admitted there was a bird problem in the unit. Second, he admitted that both facilities and safety were advised of this ongoing problem. The problem is that he also stated that there was no reported "flu outbreak" in relation to the bird infestation (although medical records will verify there was). All birds were caught and released by second shift corrections officers, the last being extracted on July 8, 2018. From the time of our May lockdown until July 8, the unit was infested with these birds.

Id. at 5.

On July 20, 2018, Plaintiff presented to Health Services via Sick Call with complaints of soft loose stools for the past 4 – 6 weeks. ECF No. 19-1 at 16 – 19. The provider noted that "[m]ild diarrhea symptoms previously reported without antidiarrheal treatment being initiated due to computer problem/error. Diarrhea symptoms have been worsening and now occur daily." Id. at 16. Plaintiff denied fever/chills, abdominal pain, loss of appetite, weight loss [sic],[19] nausea/vomiting, hematochezia (bright red blood in stool), black tarry stools, consumption of spoiled food, and steatorrhea.[20] Id. Plaintiff had normal bowel sounds, his abdomen was soft

---

[18] The final bird had already been apprehended the day before. See ECF No. 1-4 at 5.
[19] It does not appear from the record of this visit that Plaintiff's weight was checked, so it appears that the provider merely relied on Plaintiff's report that he had no weight loss; both appear unaware that for whatever reason, Plaintiff apparently lost 5.2# between June 18 – June 29, 2018.

[20] Steatorrhea is the excretion of abnormal quantities of fat with the feces owing to reduced absorption of fat by the intestine.

without guarding, rigidity, or tenderness. Id. at 18. There is nothing in the record to indicate that his vital signs were checked. He was diagnosed with "diarrhea unspecified" and prescribed a Loperamide[21] capsule to take daily for seven days. Id.

On July 26, 2018, Plaintiff received a response to his Regional Administrative Remedy Appeal from the Regional Director, Mid-Atlantic Region, who noted in pertinent part that

> . . . You assert birds living in the ventilation system caused you to become sick.
>
> A review of the matter determined the Warden's response appropriately addresses this issue. The birds were promptly removed from the ventilation system. A review of your medical record with the Regional Health Service Administrator indicates no bird  related illness . . .

Id. at 6. On August 24, 2018, Plaintiff filed a Central Office Administrative Remedy Appeal, stating that

> I filed a Regional Administrative Remedy Appeal . . . In their written opinion, "a review of your medical record with the Regional Health Service Administrator indicates no bird related illness." I assert that the records show that I was treated for symptoms caused by exposure to strains of a subtype of the causative orthomyxovirus that has produced epidemics in birds and humans (which I was not tested for). nor [sic] was there any results of the cbc and crx lab confirmation.

Id. at 7.  On November 21, 2018, Plaintiff received a response from the Acting Administrator for National Inmate Appeals, stating:

> This is in response to your Central Office Administrative Remedy Appeal where you claim you have been exposed to a bird related illness due to birds in your housing unit. You make no specific request for relief.
>
> We have reviewed documentation relevant to your appeal and, based on this information, concur with the manner in which the Warden and Regional Director addressed your issue at the time of your lower-level grievances. Once your Unit Team became aware of the situation the birds were immediately removed. We find no further relief is warranted.

---

[21] Loperamide (brand name Immodium) is an anti-diarrheal medication that slows the passage of food through the gut, thus treating the symptoms, but not the cause, of diarrhea. See Loperamide, *available at*:   < https://www.webmd.com/drugs/2/drug-4789-4025/loperamide-oral/loperamide-oral/details >

Id. at 8.

Plaintiff filed his Administrative Tort Claim Form 95 on January 18, 2019. ECF No. 1-3 at

1.  It was assigned Administrative Claim Number TRT-MXR-2019-03149. On May 23, 2019,

Plaintiff received a denial letter stating:

> Your administrative claim filed with the Bureau of Prisons under the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., has been considered for administrative settlement. You claim government liability in the amount of $3,500.00. Specifically, you allege a medical personal injury following the discovery of birds in your housing unit at the United States Penitentiary Hazelton ("USP Hazelton"), that you state caused you to become ill.
>
> An investigation into your claim failed to reveal that you suffered a compensable personal injury due to the negligence of any Bureau of Prisons staff. You reported to health services on June 18, 2018, with complaints of itchy eyes, cough, and runny nose. **Blood work and a chest x-ray showed your symptoms were related to seasonal allergies**. You had been seen in health services on May 14, 2018, with similar complaints as well, which was prior to the discovery of the birds in your housing unit. Accordingly, there is no evidence of negligence or deliberate indifference on behalf of BOP or tis [sic] medical staff, and your claim is denied . . .

Id. at 3 (emphasis added).

## B. **Plaintiff's FTCA Claims**

The FTCA is a comprehensive legislative scheme by which the United States has waived

its sovereign immunity to allow civil suits for actions arising out of the negligent acts of agents of

the United States. The United States cannot be sued in a tort action unless it is clear that Congress

has waived the Government's sovereign immunity and authorized suit under the FTCA. Dalehite

v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of

the United States Code. 28 U.S.C. §§ 1346(b), 1402(b), 2401(b) and 2671-2680. An inmate "can

sue under the FTCA to recover damages from the United States Government for personal injuries

sustained during confinement in a federal prison, by reason of the negligence of a government

employee." <u>United States v. Muniz</u>, 374 U.S. 150 (1963).  The FTCA provides at § 2674 as follows:

> The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

However, the FTCA does not create a new cause of action. <u>Medina v. United States</u>, 259 F.3d 220, 223 (4th Cir. 2001). "The statute merely permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." <u>Id.</u>

## 1) <u>Negligence</u>

Bates brings a claim of "gross negligence" against the United States for permitting 5 or 6 "wild birds" to gain access to the ventilation shafts at his USP Hazelton housing unit and remain there for "a period of 30 days, infecting the entire unit." ECF No. 1 at 6.

In order to maintain a case against the United States under the FTCA, the plaintiff must demonstrate that his action is permissible under the FTCA and satisfies the necessary elements of a tort claim cognizable under law of the state in which the action accrued.  In West Virginia, the plaintiff must establish three elements in a negligence suit: (1) a duty that the defendant owes to the plaintiff, (2) a negligent breach of that duty, and (3) injuries received as a proximate result from that breach. <u>Webb v. Brown & Williamson Tobacco Co.</u>, 121 W.Va. 115, 2 S.E.2d 898, 899 (1939). The plaintiff must prove these elements by a preponderance of the evidence. <u>Id.</u> at 899. Pursuant to the FTCA, the BOP owes prisoners a duty of care that specifically requires the BOP to provide for the safekeeping, care, subsistence, and protection of all prisoners.  <u>See</u> 18 U.S.C. § 4042; <u>Muniz</u>, 374 U.S. 150 (1963). Eighteen U.S.C. § 4042 provides that the BOP must "exercise . . . ordinary diligence to keep prisoners safe and free from harm." <u>Little v. United States</u>, 2014

17

WL 4102377, *14 (N.D. W.Va. 2014) (*citing* <u>United States v. Munitz</u>, 280 F.Supp. 542, 546 (S.D.N.Y. 1968); <u>Jones v. United States</u>, 534 F.2d 53, 54 (5th Cir. 1976)). Although 18 U.S.C. § 4042 sets forth the mandatory duty of care, it does not direct how the duty is to be fulfilled. <u>See</u> <u>id.</u> (citing <u>Calderon v. United States</u>, 123 F.3d 947, 950 (7th Cir. 1997) (finding the statute "sets forth no particular conduct that the BOP personnel should engage in or avoid while fulfilling their duty to protect inmates.")). Under West Virginia law, the duty of care that the BOP owes to inmates is one of reasonable care. <u>See</u> <u>McNeal v. United States</u>, 979 F.Supp. 431 (N.D. W.Va. 1997).

Here, there appears to be no dispute that at some point, possibly in late May or at least by June 7 or June 17, 2018, 5 or possibly 6 birds somehow gained entry to the ventilation shafts of Plaintiff's unit, Unit D-2 at Hazelton. <u>See</u> July 9, 2018 Warden's response to Request for Administrative Remedy, ECF No. 1-4 at 4.

It is unclear from the limited and at times somewhat contradictory record whether there were 5 or 6 birds; when the birds first gained entry; or exactly when they were removed, but from the record before the undersigned, it appears that Plaintiff made no complaint about it to anyone until his email to "Ms. Bird" on June 17, 2018; at that time, he admitted that 3 of the birds had already been apprehended "by the second shift officers" and that there were only 2 left "flying around." ECF No. 1-4 at 9.  However, attached to the Informal Resolution Form Plaintiff filed on or about June 20, 2018 was a statement saying that "[o]n June 7, 2018, Counselor VanKirk contacted both the medical staff and facilities department to make a complaint concerning a number of birds trapped within the unit." <u>Id.</u> at 2.  It is unclear whether the date of "June 7, 2018" was a typographical error, intended to be June 17, 2018, the date that Plaintiff emailed Ms. Bird; nonetheless, in that June 20, 2018  Request for Administrative Remedy, Plaintiff indicated that the birds had been "in the unit for over 3 weeks and still has [sic] not been removed. <u>Id.</u> at 3. Three

weeks before June 20 would have put the birds' entry date to the final days of May, 2018. Plaintiff's July 13, 2018 Regional Administrative Remedy Appeal also states that "[f]rom the time of our May lockdown until July 8, the unit was infested with these birds." Id. at 5. The record does not specify when the "May lockdown" was.   At the time Plaintiff drafted that July 13, 2018 Regional Administrative Remedy Appeal, he omitted mention of the fact that by June 17, 2018, when he first  reported it, only 2 birds were left, or that that by June 25, 2018, the Facilities Department had removed all but 1 of the birds [ECF No. 1-4 at 4], and that (by Plaintiff's own admission) the last bird had already been extracted on July 8, 2018.

Accordingly, it appears from the record that BOP staff, far from being grossly negligent, began attempting to remove the birds as soon as they were notified and continued diligently until the task was accomplished. It also proves that during much of the relevant time period that Plaintiff claims the unit was "infested" with birds and their "contagion," there may have only been 1 or perhaps 2 in the ventilation shafts, hardly an "infestation."

Further, while Plaintiff makes this broad assertion about negligence, he fails to prove the elements of negligence by a preponderance of the evidence. Specifically, Plaintiff makes no detailed allegation regarding the duty Defendant owed him. While he cites to various environmental rule violations, none of the rules he vaguely references had anything to do with environmental health. See infra at 24.  He alleges that the BOP employees did nothing about the birds, but the record does not support this. His allegations that "the entire unit" was infected, and his allegations regarding the injuries he personally claims to have received are merely further speculation, unsupported allegations with no causal connection to exposure to bird droppings. Finally, he is unable to show that any of his alleged injuries are the proximate cause of a breach of duty.

First, regarding Plaintiff's allegations of injury, a careful review of Plaintiff's admittedly limited medical records before the undersigned reveals that the first time Plaintiff complained of symptoms he attributed to the exposure to bird "contagion" was on June 18, 2018 and the last time Plaintiff complained of any symptoms that he attributed to the exposure from bird "antigens" was June 29, 2018. Nonetheless, Plaintiff's claims of injuries related to exposure to contagion from birds, exposure to "strains of a subtype of the causative orthomyxovirus that has produced epidemics in birds and humans," or avian flu[22] lack any support in the record. The symptoms of avian flu are cough, diarrhea, respiratory difficulties, fever (over 100.4°F), headache, muscle aches, malaise, runny nose, and sore throat.[23] The prognosis for bird flu infection depends on the severity of infection and the type of influenza virus causing it. H5N1 has a high mortality rate, while other types of bird flu do not. Some potential complications include: sepsis (a possibly fatal inflammatory response); pneumonia; organ failure; and acute respiratory distress. Id.

Plaintiff was seen on June 18, 2018 at 2:28 p.m. for complaints of itchy eyes, cough, and green nasal mucus. He blamed his symptoms on birds in the ventilation shafts. He had no fever or chills, and his vital signs were normal except for a slightly elevated blood pressure. His lungs were clear to auscultation; his oxygen saturation was normal. On exam he was found to have clear nasal

---

[22] Bird flu, or avian influenza, is a viral infection spread from bird to bird. Currently, a particularly deadly strain of bird flu -- H5N1 -- continues to spread among poultry in Egypt and in certain parts of Asia. Technically, H5N1 is a highly pathogenic avian influenza virus that is deadly to most birds; it is also deadly to humans and other mammals that catch it from birds. Since the first human case in 1997, H5N1 has killed nearly 60% of the people who have been infected. Migrating water fowl -- most notably wild ducks -- are the natural carriers of bird flu viruses. It's suspected that infection can spread from wild fowl to domestic poultry.

People catch bird flu by close contact with birds or bird droppings. However, what "close contact" means differs from culture to culture: some people have caught H5N1 from cleaning or plucking infected birds; in China, there have been reports of infection via inhalation of aerosolized materials in live bird markets. It's also possible to become infected after swimming or bathing in water contaminated with the droppings of infected birds. Infections have also occurred in people who handle fighting cocks. See Frequently Asked Questions About Bird Flu, *available at*: < https://www.webmd.com/cold-and-flu/flu-guide/what-know-about-bird-flu#1 >

[23] See What are the symptoms of bird flu? *available at*: < https://www.healthline.com/health/avian-influenza#symptoms >

discharge, sinus drainage, and fluid behind his ear drums. A chest x-ray later proved to be normal. He appeared well and was not distressed. See ECF No. 1-2 at 5, 2. He received an injection of Methylprednisolone acetate (Depo-Medrol), a steroid, to suppress his symptoms and make him more comfortable. A chest x-ray and a complete blood count were ordered. He was diagnosed with allergic rhinitis, or hay fever. The results of the chest x-ray later proved to be normal.  Although Plaintiff contends he was never given the results of the chest x-ray or the CBC, his May 23, 2019 Administrative Tort Claim denial letter states "[b]lood work and a chest x-ray showed your symptoms were related to seasonal allergies." ECF No. 1-3 at 3.

Plaintiff was seen again on June 29, 2018 for a several-day history of sneezing, watery eyes, and a runny nose, but indicated that the symptoms were already improving. He attributed his symptoms to exposure to bird dropping "antigens." He denied fever, chills, shortness of breath, chest pain, cough, nosebleed or coughing up blood.  His ear drums no longer had fluid behind them. His vital signs were within normal limits. He denied vomiting and diarrhea. He was diagnosed with a common cold.  ECF No. 19-1 at 12.

Second, Plaintiff's unsupported allegation that he was "exposed to strains of a subtype of the causative orthomyxovirus that has produced epidemics in birds and humans [ECF No. 1-4 at 7] is meaningless and constitutes pure speculation; Plaintiff has produced nothing to support such a claim. Plaintiff exhibited no symptoms of flu such as fever or body aches after his purported "exposure" to the birds.  Furthermore, orthomyxovirus is merely the causative agent for the common flu;[24] it has nothing whatsoever to do to exposure to bird droppings, real or imagined.

---

[24] See Medical Microbiology, 4th edition; Orthomyxoviruses, *available at*: < https://www.ncbi.nlm.nih.gov/books/NBK8611/ >

Likewise, Plaintiff has produced no evidence that he or, for that matter, any other inmate at USP Hazelton were ever "infected" or ever contracted avian flu as a result of the birds in Unit D-2; not only has he produced no evidence to suggest that he ever actually personally came into contact with bird droppings, any minimal exposure he could have had to the same does not rise to the level necessary to support such a conclusion, given that actual "close contact with birds or bird droppings" is necessary to become infected. Plaintiff's mild and fleeting symptoms at the June 18 and June 29, 2018 do not support such a diagnosis. Plaintiff's records also do not show that he was ever diagnosed or treated for a "sinus infection."

As for Plaintiff's reports of diarrhea, which admittedly can be one of the symptoms of avian flu, the records are contradictory on that point as well. On June 18, 2018, he reported constipation as well has having had diarrhea on one occasion; he specifically denied diarrhea on June 29, 2018; nonetheless, on the July 20, 2018 visit, he reported having had loose stools for the past 4 - 6 weeks which had been worsening, but were by then occurring daily; Immodium was prescribed to control it.  There is no further mention of it in the limited record before me. However, Plaintiff's complaint was not filed until September 5, 2019; presumably there was no further problem with diarrhea, or Plaintiff would have included mention of its persistence. Finally, a careful review of Plaintiff's medical record does not support Defendant's contention that Plaintiff attributed his diarrhea to exposure to "bird dropping antigens" [see ECF No. 18-1, ¶ 7 at 3]; there is nothing in the notes of the July 20, 2018 to suggest the same.

Accordingly, while the undersigned recognizes that although Plaintiff's complaint was signed under penalty of perjury, the Defendant has produced sworn declarations from two BOP personnel, one of which attests to its version of the facts and completely contradicts Plaintiff's story. Plaintiff has produced no evidence, nothing beyond bald assertions and conclusory

statements about the BOP breaching its duty of care and the nature and extent of his injuries. The facts in the record blatantly contradict what Bates has claimed. Bates' claim of a breach of duty must therefore fail. See Scott v. Harris, 550 U.S.372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Because Plaintiff has not produced any evidence of a breach of duty on the part of the Government, or any evidence of damages, beyond his own assertions and speculation, which are contradicted by the record, his negligence claim fails to state a claim upon which relief can be granted and cannot survive summary judgment, and judgment on the same should be for the Defendant.

## 2) Deliberate Indifference

"Deliberate indifference" claims are constitutional claims that are not cognizable under the FTCA.[25] Plaintiff's claim that the United States was deliberately indifferent to the birds in the ventilation shaft endangering his health states an implied constitutional claim of violation of his Eighth Amendment rights.  Such a claim is not actionable against the United States in a FTCA action. A constitutional tort is not cognizable under the FTCA.  Royster v. United States, 2008 U.S. Dist. LEXIS 106634 *13 (W.D. Pa. December 1, 2008).

---

[25] Claims regarding conditions of confinement, excessive force, and deliberate indifference to serious medical needs, in violation of Eighth Amendment rights to be free of cruel and unusual punishment, or other constitutional claims are not actionable against the United States in a FTCA 28 USC §2671 et seq. action. A constitutional tort is not cognizable under the FTCA.  Royster v. United States, 2008 U.S. Dist. LEXIS 106634 *13 (W.D. Pa. December 1, 2008). Accordingly, any constitutional claims must be dismissed for failure to state a claim upon which relief can be granted.

Had the undersigned not already addressed Plaintiff's "gross negligence" claim, it would be proper to construe Plaintiff's deliberate indifference claim as one of negligence, because Bates impliedly alleges that the Government owed him a duty to protect him, and that this breach resulted in injuries.

However, even assuming Plaintiff's terse allegation of deliberate indifference regarding the presence of birds in the housing unit had been raised in a civil rights action, it would still not rise to the level of a viable constitutional claim. See Allen v. Engelson, 2016 WL 4245514, *4 (N.D. Ill. 2016) ("Plaintiff's six days of exposure to mice and birds does not rise to the level of an objectively serious and protracted infestation claim. […] A brief and limited exposure like that […], unpleasant though it may have been, does not rise to an 'extreme' deprivation that offends the constitution."); see also Walker v. Collier, 2019 U.S. Dist. LEXIS 53431, *18 - 19 (E.D. Tex. March 28, 2019)(An allegation that the prison dining hall was filthy, infested with birds, spiders, and insects, without an allegation of resultant harm did not state a constitutional claim, because the Constitution does not require that prisons be completely sanitized or as clean and free from potential hazards as a person's home might be, nor does the Constitution protect prisoners from discomfort and inconvenience).

Accordingly, this claim should be dismissed for failure to state a claim upon which relief can be granted.

### 3) Violations of Environmental Health Rules

Plaintiff alleges that the Defendant injured him by violating various unspecified "rules concerning the environmental health and safety code." ECF No. 1 at 6. The complaint makes no further mention of what rules Plaintiff is referring to, but the "Attachment" to his Administrative Tort Claim, states that

> These conditions are unsanitary and violations of the rules for health and safety in this institution. This is a clear case of misconduct (3420.11), conduct that could lead others to question an employees' impartiality (Rule 38), institutional violations of the rules (Rule 41), reckless disregard of the rules (Rule 42), and negligent violations (Rule 43).

ECF No. 1-4 at 2.

Plaintiff is a *pro se* litigant whose pleadings are to be liberally construed and held to a less stringent standard. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). However, "[t]his rule requires the Court to look beyond a failure to cite proper legal authority, confusion of legal theories, and poor syntax or sentence construction. Id. The Court is not authorized to become the advocate for the *pro se* litigant. Id. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts that set forth a claim cognizable in a federal district court.  Weller v. Dept. of Social Services, 901 F.2d 387 (4th Cir. 1990). Although Fed. R. Civ. P. 8(c) provides that "all pleadings shall be so construed as to do substantial justice," the Fourth Circuit further holds that a "heightened pleading standard" is highly appropriate in actions against government officials. Randall v. United States, 95 F.3d 339 (4th Cir. 1996). See also Dunbar Corp. v. Lindsey, 905 F.2d 754, 764 (4th Cir. 1990). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. See Forsyth v. Barr, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994). Further, "[d]istrict judges are not mind readers. Even in the case of *pro se* litigants, they cannot be expected to construct full blown claims from sentence fragments . . ." Beaudett v. City of Hampton, 775 F.2d 1274, 1278 (4th Cir. 1985); Farabee v. Feix, 119 Fed. Appx. 455, 457 (4th Cir. 2005).

Here, Plaintiff's terse reference to "(3420.11)" without identifying it as BOP Program Statement ("BOP P.S.") for Standards of Employee Conduct, and references to "(Rule 38), institutional violations of the rules (Rule 41), reckless disregard of the rules (Rule 42), and

negligent violations (Rule 43)" without explaining that these "rules" are merely "Nature of Offense" violations contained within BOP P.S. 3420.11 prohibiting certain behaviors on the part of BOP staff, and setting forth penalties for the same, leave the undersigned struggling to glean meaning from Plaintiff's pleadings. A careful examination of BOP P.S. 3420.11 reveals nothing regarding "environmental health and safety code" and nothing remotely applicable to the any of allegations in Plaintiff's complaint regarding the BOP's willful or negligent ignoring of a situation with birds in the air shafts, leaving inmates exposed to "contagion."

Because the analysis above shows that the Defendant was *not* negligent and that its employees diligently worked to remove the birds from the ventilator shafts once they were on notice of their presence, and Plaintiff cannot show any causal connection to any injury associated with the same, this claim should be dismissed as frivolous and for the failure to state a claim upon which relief can be granted.

## 4) <u>Medical Negligence</u>

To the extent that Plaintiff's claims that the Defendant did not properly test and/or treat him for avian flu, or for potential exposure to "strains of a subtype of the causative orthomyxovirus that has produced epidemics in birds and humans," and did not disclose the results of his chest x-ray and CBC to him can be liberally construed as an implied claim of medical negligence, Plaintiff must comply with West Virginia law and establish that:

> (a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code § 55-7B-3.

When a medical negligence claim involves an assessment of whether the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under West Virginia law, certain requirements must be met before a health care provider may be sued. W.Va. Code § 55-7B-6. This section provides in pertinent part:

§ **55-7B-6**. Prerequisites for filing an action against a health care provider; procedures; sanctions.

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the Rules of Civil Procedure.

This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatary prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp. 2d 805, 806-807 (N.D. W.Va. 2004).

With regard to the appropriate standard of care, Plaintiff has not sustained his burden of proof. Plaintiff does not even assert, much less establish, the standard of care for diagnosis and/or treatment for a suspected case exposure to orthomyxovirus, or the standard of care for diagnosis and/or treatment for a case of suspected avian flu from exposure to bird droppings.  Further, this is not a case of alleged malpractice so obvious that it entitles Plaintiff to the common knowledge exception of W.Va. Code § 55-7B-6(c). Thus, any possible claim as to medical negligence must be dismissed for failure to state a claim upon which relief can be granted.

## VI. <u>Recommendation</u>

In consideration of the foregoing, it is the undersigned's recommendation that the Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment [ECF No. 18] be **GRANTED,** and Plaintiff's FTCA complaint [ECF No. 1] be **DISMISSED with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), for failure to state a claim upon which relief can be granted**.

Further, the undersigned **RECOMMENDS** that the Defendant's pending Motion to Dismiss for Lack of Prosecution [ECF No. 30] be **DENIED as moot**.

**Within fourteen (14) days** after being served with a copy of this Recommendation, any party may file with the Clerk of the Court written objections identifying the portions of the Recommendation to which the objections are made. Objections shall identify each portion of the magistrate judge's recommended disposition that is being challenged and shall specify the basis for each objection.  Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitation, consistent with LR PL P 12. A copy of such objections should also be submitted to the United States District Judge.

**Failure to timely file objections as set forth above will result in waiver of the right to** *de novo* **review by this Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), *cert. denied,* 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* Petitioner by certified mail, return receipt requested, to his last known address as reflected on the docket sheet, and to transmit a copy electronically to all counsel of record.

This Report and Recommendation completes the referral from the district court. The Clerk is directed to terminate the Magistrate Judge's association with this case.

DATED: June 29, 2020

/s/ *Michael John Aloi*
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE